UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION

CASE NO.: 16-cv-80243-KAM

KATHY E. EMERY,

    Plaintiff,

v.

ALLIED PILOTS ASSOCIATION,

    Defendant.

_____/

## NOTICE OF ERRATA

Plaintiff, Kathy E. Emery hereby notifies the Clerk of the Court that a mistake was made when Plaintiff filed her initial complaint on February 19, 2016 in Re: Kathy E. Emery v. Allied Pilots Association. The complaint was inadvertently filed with several pages missing. This went unnoticed because the signature page was attached to the papers filed.

Plaintiff respectfully requests that the Clerk of the Court docket the complete document attached hereto.

Respectfully submitted this 22nd day of February, 2016

/s/ Kathy E. Emery
Kathy E. Emery
Mailing Address:
1050 N.E. 91st Street
Miami, Florida 33138
(305) 758-9650

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION


KATHY E. EMERY,

        Plaintiff,

v.

ALLIED PILOTS ASSOCIATION,

        Defendant.
_____/


PLAINTIFF DEMANDS TRIAL BY JURY


        Kathy E. Emery
        Mailing Address:
        1050 N.E. 91st Street
        Miami, Florida 33138
        (305) 758-9650

## COMPLAINT

COMES NOW, Plaintiff, Kathy E. Emery, and hereby files her Complaint against the Defendant, ALLIED PILOTS ASSOCIATION, and says:

### I. JURISDICTION AND VENUE

1. Plaintiff Kathy E. Emery on behalf of herself brings this action against defendant Allied Pilots Association (the "APA"). The suit is based upon defendant's breach of its duty of fair representation, and arises under the Railway Labor Act ("RLA"), 45 U.S.C.§§ 151, (1976) *et.seq.* and pursuant to Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act (ADEA) of 1967 as amended, and the Americans with Disabilities Act Amendment Act of 2008, (ADAAA). This Court has original federal question Jurisdiction over the claims asserted by Plaintiff pursuant to 28 U.S.C. §§ 1331 and 1337. Venue is proper pursuant to 45 U.S.C. §§ 153 (q) and (p) since defendant has either substantial contacts in the state of Florida, and the Plaintiff resides in the state of Florida and is subject to personal jurisdiction. Venue is also proper pursuant to 28 U.S.C. § 1391 (b) and (c)

### II. PARTIES

2. Plaintiff, Kathy Emery ("Emery"), is a citizen of the United States, who resides in the State of Florida. At all times relevant to the facts and claims asserted herein, Plaintiff is and had been a member in good standing of the Defendant Allied Pilots Association and a pilot who is covered under the Collective Bargaining Agreement between American Airlines, Inc., ("American") and the Allied Pilots Association.

3. Defendant Allied Pilots Association (the "APA") is a labor organization with its principal office in the State of Texas. The APA has been accorded exclusive recognition, and is

the exclusive representative of the pilot employees in the service of American Airlines, Inc., ("American") or "AA") and is entitled to act for, and negotiate collective bargaining agreements covering all pilots in the bargaining unit.

### III. FACTUAL BACKGROUND

#### Employment History

4. On September 2, 1992 Plaintiff Kathy Emery was hired as a Commercial Pilot for American Airlines, Inc. Prior to that date Plaintiff had enjoyed a successful career as a pilot for Pan American World Airways (Pan Am)

5. Plaintiff was hired by American Airlines after Pan American Airlines ceased operations in 1991.

6. When Plaintiff was hired by American, she was a highly qualified individual and had always held a FAA First Class Medical Certificate.

#### Medical Disqualification/Disability History

7. After more than ten (10) years of service with American Airlines, Plaintiff was medically disqualified from performing duties as a pilot following a required medical evaluation, conducted by the company.

8. In or around April 2003 Plaintiff filed for long-term disability benefits under American Airlines Retirement Benefit Program.

9. Prior to approving Plaintiff's benefits, American Airlines Corporate Medical Director, Thomas H. Bettes, M.D., directed Plaintiff to contact and begin treatment with an American Airlines assigned physician, Dr. Enrique M. Suarez, Initiating this treatment and Following Dr. Suarez recommendations was a pre-condition for receipt of disability benefits and eventual medical return to work. Failure to comply with AA's directives would subject

Plaintiff to termination for insubordination.

10. After Plaintiff initiated treatment with Dr. Suarez, Dr. Bettes approve Plaintiff for long-term disability benefits under the Program, effective March, 2003.

11. During the next four years, Plaintiff satisfied all Program requirements and continuously received monthly disability benefits, including continuous medical care and treatment from Dr. Suarez, who regularly provided American's medical department with updates regarding Plaintiff's condition.

12. On January 25, 2007, notwithstanding American's full knowledge of Plaintiff's compliance with its medical directives, and direct contact with her American Airlines assigned physician, Dr. Thomas Bettes terminated Plaintiff's disability benefits without prior notice. .

13. Plaintiff's disability benefits were automatically stopped when Dr. Bettes, notified American Airlines Pension Plan Administration, "that medical information pertaining to the continuation of Plaintiff's long term disability benefits had been requested and due to lack of Substantiation disability benefits cease on January 31, 2007."

14. Plaintiff received notice from Dr. Bettes that disability benefits are being terminated ex post facto. The notice stated in part, "it cannot be established, that you continue to remain disabled and unable to pursue obtaining your FAA medical certificate with the goal of returning to your job as a pilot for American Airlines."

15. Upon Plaintiff's receipt of that notice, Plaintiff immediately contacted American Airlines Medical Department and AA's Disability Nurse Case Manager, Jeanne Spoone, seeking further clarification.

16 Plaintiff was informed that no additional information would be provided and Plaintiff's only recourse was to file an administrative appeal with American Airlines Pension

Benefits Department (PBAC).

17. On February 28, 2007, Plaintiff wrote Dr. Bettes a letter requesting further clarification and requesting that he schedule Emery for a FAA First Class Medical and AA Medical Clearance to Return to Work (RTW), pursuant to Section 20 and other provisions of the pilots Collective Bargaining Agreement (CBA).

18. Neither Dr. Bettes nor American ever responded to Plaintiff's letter.

19. Plaintiff also contacted the Miami Flight Office who advised her that she should direct all inquiries to Dr. Bettes, American Airlines Corporate Medical Director.

## The Disability Appeal

20. August 20, 2007, with no response from AA Medical concerning Plaintiff's request for medical clearance to return to work, Plaintiff appealed the adverse benefit determination with AA's Pension Benefits Administration Committee (the "PBAC") which appeal was denied on October 22, 2007.

21. The denial notice stated in part, "Western Medical Evaluators, Inc. (a medical consulting company under contract with American Airlines) determined that the evidence presented does not document your continued disability or receipt of continued appropriate medical care.

22. This despite the fact that since 2003 through the decision date, Plaintiff was under the care of a physician selected and assigned to Plaintiff by American Airlines (See ¶ 9 above) and Plaintiff was fully compliant with all of American Airlines treatment recommendations.

23. Citing WME's report, on October 22, 2007 the PBAC upheld Dr. Bettes termination of Plaintiffs benefits.

24. More than three years later, Plaintiff discovered that WME was not a clinical source,

as was required under the Plan and the pilots Collective Bargaining Agreement, but was instead a small workers-compensation claims processor that worked for large companies and insurers.

25. Plaintiff would later learn that the medical license of WME's principal and Corporate Medical Director, Dr. Howard Douglas, had been revoked by the Texas Medical Board for "dishonorable, and unprofessional conduct likely to defraud or deceive public in the future, and professional failure to practice medicine in an acceptable manner consistent with public welfare."

26. In July 2008, WME was sued by Capital Funding Solutions, Inc. in the US District Court, FLSD, Case No. 08-61106-SEITZ, for perpetrating two separate and distinct fraudulent Schemes," which consisted of acts of medical claim fraud, and billing fraud, involving false claim forms and altered claim forms. These acts were committed from January 2007 through July 2008, during the precise time-frame American Airlines PBAC Committee used WME to review career pilots; disability claims.

27. Significantly, in that case, former WME employees testified that WME paid doctors 120% of their normal fee to wrongfully deny claimant's benefits, that WME's principal directed Employees to perform illegal acts, and that WME's principal would not wait on doctors to complete reports, and instead would create and sign the evaluation reports herself.

28. During the period of time that American Airlines utilized WME to conduct pilot medical reviews, American Airlines Disability Nurse Case Manager, Jeanne Spoon tracked cost savings data on spreadsheets she compiled. Documentation from the spreadsheets were used to calculate cost savings using two dates-the benefit termination date and the estimated return to work date of disabled American Airlines pilots.

29. Cost savings from AA Medical's termination of pilot's disability benefits and WME's decisions to uphold these terminations were tracked on Nurse Spoon's spread sheets.

30. In August 2008, WME was permanently shut down by the Texas State Insurance Board and WME and its principals were charged with felony workers compensation claim and billing fraud and subsequently convicted and sentenced. WME's Medical Director, Dr. Howard Douglas, was sentenced to 5-years of incarceration and was ordered to pay restitution for fraudulent charges.

31. In response to Plaintiff's and other pilots requests for medical information from doctors whose names are depicted on WME reports, these doctors were unable to produce any medical records in Plaintiff's case. Dr. Karen Grant, a senior aviation medical examiner whose signature appears on pilots medical reports submitted to American Airlines stated to Plaintiff and other pilots that her signature had been electronically affixed to reports without her knowledge and consent, for which she had no medical records.

32. During the period of time from 2004 to 2007, American's defined benefit pension plans were grossly under-funded. During the period of time American's annual SEC 10K Report shows substantial funding obligations ranging from $2.1 billion to $2.5 billion. This report also acknowledged American's understanding that due to substantial pension funding obligation, it would need access to additional funding and that the inability of American to obtain additional funding would have a material negative impact on the ability of American to sustain its operations over the long-term.

33. Pilot FO Lawrence Meadows obtained deposition testimony from key individuals in American's medical department and human resources department, including senior budgeting analyst Susan Roberson, who admitted that the Cost Savings Program was administered by the

American medical department that was overseen by AA's Corporate Medical Director, Thomas H. Bettes, M.D.

34. During the same period of time from 2005 through 2008, Defendant, Allied Pilots Association also sought to significantly reduce its disability costs under the APA's own voluntary disability plan. Several revisions were made to the APA Disability Income Plan (Loss of License) in order to reduce costs of the plan and in 2008 the APA Loss of License Plan, was terminated by the APA and replaced with the Pilot Occupational Disability Plan.

35. During this period of time, Plaintiff had a claim for APA Disability benefits under the APA Loss of License Plan. Not unlike American, Defendant APA failed to timely pay all disability benefits under the plan and failed to administer Plaintiff's claim within the time prescribed by law. So in 2011, after APA's protracted delays in the claims administrative process lasting nearly eight years, Plaintiff filed suit against Defendant APA to enforce her rights under ERISA.

36. Judgment was granted in favor of Plaintiff Kathy Emery against the Defendant Allied Pilots Association in the amount of $47,058.29 for interest on delayed disability benefit payments and an order was entered awarding Plaintiff Kathy Emery prevailing party costs in the matter. *See* Case No.: 11-81123-CV-KLR

37. Plaintiff has recently learned that Allied Pilots Association was directly involved in the selection of WME who had a documented history of questionable medical practices after determining that there would be a cost savings to the APA associated with the selection of WME.

38. It appears that APA had rejected two highly respected independent medical reviewers suggested by APA's long-time Aviation Medical Consultant (AMAS) who recommended the Mayo Clinic and the University of Texas Medical Branch in Galveston, Because the wanted to perform an independent medical examination of the patient

39. Following the PBAC's October 22, 2007 decision in which it was determined there was no evidence of a continued disability, Emery immediately contacted American Airlines Medical Department to coordinate her medical clearance to return to work.

### FO Kathy Emery's Grievance No. 07-082

40. By letter dated November 12, 2007, from Captain Tom Hynes, Managing Director of Flight Miami, to FO Emery, she was advised, "As a result of your failure to qualify for Long Term Disability, you are on unauthorized leave of absence." A hearing was scheduled to discuss Emery's plan to return to work on November 20, 2007.

41. At the onset of the hearing held by Captain Brian Fields, Base Manager-Chief Pilot Miami, handed FO Emery a letter dated November 20, 2007, signed by Captain Fields, directing her to take all steps necessary to return to work...and directing her to contact AA Medical to coordinate clearance to active duty no later than November 30, 2007. The letter further threatened Plaintiff with termination, stating, "Failure to comply with this directive will be considered a violation of American Airlines Rules and Regulations, Rule 7, Insubordination and will result in immediate termination.

42. At the hearing Emery informed Captain Fields of her disability history with American Airlines as described above and her immediate desire to return to work. Emery also testified about her prior attempts beginning in February 2007 to coordinate with AA Medical her medical clearance to return to work.

43. FO Emery requested and Captain Fields agreed to intercede on her behalf and scheduled an appointment with American Airlines Corporate Medical Director, Thomas Bettes for the purpose of getting her FAA First Class Medical and return to work clearance.

44. Following the hearing, by e-mail to Emery's Miami Union Representatives, Captain Fields confirmed that Emery was in compliance with AA's November 20, 2007 directive and confirmed her scheduled appointment with Dr. Bettes for December 12, 2007. Captain Fields reiterated though, that Plaintiff's failure to appear at the scheduled appointment would be considered insubordination, thereby subjecting Plaintiff to immediate termination. (See ¶ 18 above)

45. December 10, 2007 the APA prepared a Grievance, signed by Plaintiff protesting the hearing conducted November 20, 2007 and Company's violation of the CBA and past practices (in connection with among other things) improperly removing her from disability, placing her on an "unauthorized" leave of absence while failing to place Plaintiff on a proper pay status of PW, and improperly investigating her.

46. December 12, 2007, Plaintiff appeared as scheduled for her appointment with Dr. Bettes, would not conduct the required medical evaluation as directed by Captain Fields nor did he grant Plaintiff's medical clearance to Return to Work (RTW).

47. During discussion with Dr. Bettes, Plaintiff requested she be placed on a proper paid status of Paid Withhold (PW) or Awaiting Training or that she be granted a reasonable accommodation pending her medical clearance to RTW.

48. Subsequently, internal company e-mails between Dr. Bettes and the Miami Flight Office, show a determination was made that FO Emery was in full compliance with all of

American Airlines directives and that she should have been placed in a PW status, awaiting training status or granted a special assignment (accommodation).

49. To the extent that Dr. Bettes still considered Emery to be medically disqualified or unable to hold an FAA First Class Medical, which contradicted Dr. Bettes prior position, then Captain Fields agreed that Emery should be placed on a PW status which is a full paid status or disability status.

50. Beginning in or around June 2008 American Airlines initiated an investigation following FO Emery's complaint to American Airlines Business Ethics & Compliance Department alleging unfair treatment and discrimination. [Case No. 80330556601].

51. Emery's internal business ethics Complaint No. 80330556601 was assigned to investigator Micheal Chianese, who was instructed to contact Kathy Koorenny, APA legal, "because it appears there is some history." Michael Chianese reported that he spoke with David Gilbert, Miami Flight Administration Manager, who falsely advised him that,

> *"she refused to substantiate her disability, including not showing up for a required medical evaluation, and therefore she is not eligible for her FAA Certification. Dr Bettes requested medical info on 1/25/07 that was not provided and her LTD Benefits were ceased on 1/31/07 per AA Medical, of which she had 180 days to file an appeal, which she didn't do. Gilbert has reams of documentation on this issue.."*

52. Based on patently false information provided by Dave Gilbert and without any communication at all with FO Emery, Mr Chianese determined that her allegations were unsubstantiated and closed the case with no action.

53. On March 18, 2009, the APA President Lloyd Hill submitted Plaintiff' Grievance No.: 07-082 to the System Board of Adjustment seeking to place Plaintiff in a proper paid status of PW or Awaiting Training, which can only be held by employees of American Airlines.

54. Despite repeated attempts by Plaintiff to ascertain the results of her internal company complaint, she was never informed that the investigation had been closed or the basis of the closure.

55. APA records now show that Plaintiff Emery was wrongfully terminated by American Airlines effective October 18, 2007 without notice, a date which pre-dates her company grievance.

56. Plaintiff's termination was improper under the terms of the pilots CBA and there is certainly a reasonable presumption that FO Emery would prevail on her grievance.

57. Plaintiff's grievance challenging her employment status seeks to place Plaintiff in a proper paid status of PW or Awaiting Training, which can only be held by an American Airlines employee.

58. The arbitration which had been submitted to the System Board of Adjustment in March of 2009 had not yet been scheduled when American Airlines filed Bankruptcy on November 29, 2011.

59. The APA which is the certified collective bargaining representative, under the Railway Labor Act, for American Airlines pilots, filed a Proof of Claim #8331 on July 13, 2012 against the debtor American Airlines for claims related to grievances involving APA and/or its member pilots that rise from conduct or breaches of the 2003 CBA (including the supplemental Agreements) and other separate agreements between American and the APA.

60. November 16, 2012, APA and Debtor entered into a Letter of Agreement (<u>Settlement Consideration and Bankruptcy Protection</u>) providing for among other things, the Settlement of claims of APA, on behalf of itself or the pilots represented by the APA, against American.

61. The Agreement which was incorporated into the new Collective Bargaining Agreement excluded all pending grievances with the exception of the most serious grievances. Plaintiff's Grievance No. 07-082 was one of the named grievances incorporated by settlement into the new Collective Bargaining Agreement. The dollar amount of Plaintiff's claim when submitted to the Bankruptcy Court by APA was then already well in excess of $600,000.00.

62. On February 6, 2015 APA advised Plaintiff that the Company may be willing to schedule grievances for arbitration, now that the Joint Collective Bargaining Agreement had been concluded, and to that end provided Plaintiff with a list of arbitration slots for 2015. This was six years after APA President Lloyd Hill submitted my grievance to the System Board of Adjustment. During that period of time, APA had attributed the delay in scheduling arbitrations to American Airlines.

63. On February 9, 2015 Plaintiff advised APA that she would prefer a time slot the second half of the year citing as a key factor the selection of the arbitrator and the time needed to prepare the case and stated as follows:

> *"I understand that we are entitled to reasonable discovery. Also I understand that APA will need to call a number of witnesses in my case. Realistically, I would have liked this to happen yesterday. However, because of the length of time that has passed, APA will need enough time too fully prepare and arrange to call witnesses. Here the stakes are very high for me, so I would like the APA to have the time it needs to be fully prepared. I am thinking sometime in the second half of the year...Most important issue for me is to be fully prepared."*

> *"Also, I would like to begin discussing the case with you as soon as possible. Please let me know when either you or Bennett will be available. I'm available most any time and would be willing to come to Dallas to start preparing for the arbitration"*

64. On February 18, 2015 APA sent Plaintiff an updated list of arbitrators to include first names. On February 26, 2015 Plaintiff sent APA Staff Attorney Trish Kennedy a list of

three arbitrators and dates in order of preference. (1) Arbitrator Richard Kasher on September 16-18, 2015; (2) Arbitrator Dana Eischen on September 29-October , 2015; (3) Arbitrator Fred Horowitz for August 18-20. However, it appears that APA did not proffer Plaintiff's Arbitration schedule to the company until several months later.

65. In 2014 Staff Attorney, Trish Kennedy suggested she may be able to move the Arbitration forward and initially suggested Arbitrator Stephen P. Goldberg, who was selected by APA President Keith Wilson to presided over the APA Equity Proceedings in which Emery participated, and currently has an action pending in the FLSD pertaining to the APA Equity Distribution, *See* 14-80518-KLR. Clearly Mr. Goldberg would have been conflicted from hearing Emery's grievance. Ultimately, according to Ms. Kennedy, Arbitrator Goldberg was removed from the list of agreed upon arbitrators by American Airlines.

66. Thereafter APA notified FO Emery that the company offered to arbitrate before Arbitrator Weinstein on a specific date without regard for her preferences for arbitrators and the arbitration dates. Arbitrator Weinstein's name did not appear on the list of approved arbitrators provided FO Emery by APA.

67. It was not until June 8, 2016, that APA informed Plaintiff that they had submitted my list of preferences to American and American had agreed to Plaintiff's selection of Arbitrator Kasher for September 16-18, 2015.

68. On June 8, 2015 APA informed Plaintiff that the deadline to exchange witness lists and documents was 21 days in advance of the hearing date which was August 25, 2015., Accordingly Emery attempted to arrange a meeting with APA to assist with documents which APA had in their possession and disclosure of witnesses in advance of that date.

69. On August 20, 2015 APA Staff Attorney Trish Kennedy agreed to meet with Plaintiff for several minutes while Plaintiff was in Dallas, Texas for other APA business, claiming the visit limited because it was unannounced.. Ms. Kennedy could not discuss documents or witnesses to any extent during that brief meeting, nor would Ms. Kennedy take or any of the documents FO Emery had brought with her, that she wanted marked as exhibits in her arbitration.

70. Prior to that date, FO Emery had informed Ms. Kennedy she would be in Dallas for other APA business during the week and would like to meet and confer with APA legal about her upcoming Arbitration. However, no meeting was scheduled by the APA during that time period.

71. On August 25, 2015, FO Emery received Notice from the APA that American had filed a request for Bifurcation with the Arbitrator with Exhibits, which was within the time allotted for exchange of documents. In that notice, APA sought to have a telephone conference with the arbitrator about the issue.

72. On August 26, 2015 per APA's request, Emery conferred by telephone with APA Staff Attorney Trish Kennedy and Bennett Boggess about American's Bifurcation letter and Exhibits. At that time Emery advised APA that she wanted to be present during the telephone conference or that a proper transcribed record of the proceeding be made, because Emery believed that the bifurcation request was an attempt by American to limit or mischaracterize the nature of her grievance.

73. During the August 26, 2015 teleconference, Emery was informed that APA had not submitted any documents to American Airlines; had not provided American a witness list, or made any arrangements to have witnesses appear at the arbitration hearing. Nor had APA

agreed to a date to meet and confer with Emery about documents or witnesses, despite the fact that Emery had provided APA with a list of potential witnesses in July 2014.

73. On August 28, 2015 Attorney Trish Kennedy informed Emery for the first time that APA President Keith Wilson who is not an attorney controls her grievance and that he is the decision maker.

74. Keith Wilson had and has a serious conflict of interest. He stripped FO Emery and other pilots with a history of disability of their right to participate in union activities, an action for which Plaintiff filed a suit against the Allied Pilots Association. *See* Case No.:14-80518-CIV-KLR.

75. President Keith Wilson's "hostile discrimination" amongst Plaintiff Emery and its union members who were disabled or had a history of disability and his stated control over her grievance and APA's failure to properly prepare for the arbitration of Plaintiff Emery's grievance by the August 25, 2015 discovery cutoff date necessitated that Emery postpone her grievance and request independent third party representation which APA refuses to provide.

## CONCLUSION

Plaintiff Emery has been held out of service from her job as a pilot with American American Airlines, Inc. for nearly eight years  nowawaiting her grievance. APA's perfunctory preparation for FO Emery's grievance by her union representatives and their failure to fairly represent necessitating a postponement of the grievance after waiting so long to have the grievance scheduled, amounts to APA's violation of its duty to fairly represent FO Emery Plaintiff believes APA's lack of preparation for the grievance and its failure to fairly represent was intentional, invidious, and directed at Kathy Emery who continues to speak up not only for herself but all disabled APA pilot members.

## IV.  CAUSE OF ACTION

## COUNT 1: BREACH OF THE DUTY OF FAIR REPRESENATION IN VIOLATION OF THE RAILWAY LABOR ACT

76. Plaintiff incorporates the allegations contained in Paragraphs above as if fully stated herein and says further that:

77. The failure of the Defendant Allied Pilots Association to fairly represent Plaintiff Kathy Emery, who had been wrongfully terminated by American Airlines in is a breach of the APA's duty to fairly represent Kathy Emery, who was and is a member of the Allied Pilots Association.

78. The effect of Defendant's failure to fairly represent Kathy Emery in a reasonalble manner is a violation of the Railway Labor Act.

79. But for the arbitrary, discriminatory and deliberate, bad faith actions of the APA, in regard to Plaintiff, Kathy Emery's grievance, she would have enjoyed the same employee pay and benefits as enjoyed by other pilot members of the Allied Pilots Association

## V.  PRAYER FOR RELIEF

**WHEREFORE,** Kathy Emery respectfully request that the Court enter judgment in her favor against the Allied Pilots Association for damages resulting from the breach of duty of fair representation of pilot Emery, consisting, among other things, of compensation for lost benefits and/or wages, due to the arbitrary, discriminatory, and bad faith acts of the APA in the perfunctory handling of her grievance.  Defendant prays that the Court will make FO Emery whole by awarding her the pay and/or benefits allowed other pilot members (plus interest) and cost of suit;

  i. Award such further relief as the Court deems just and proper.

Respectfully submitted this 19th day of February, 2016.

_____
Kathy E. Emery
Mailing Address
1050 N.E. 91st Street
Miami, Florida 33138
9305) 758-9650